UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JENNIFER CIULLA and )
LAWRENCE CIULLA, )
)
   Plaintiffs, )
)
    v. ) CIVIL ACTION
) NO. 98-10141-WGY
MILES RIGNY, GEN LINSKY, and )
THE CITY OF GLOUCESTER, )
)
   Defendants. )
———————————————————————————)

MEMORANDUM AND ORDER

YOUNG, C.J.           March 8, 2000

I. INTRODUCTION

   This rather anomalous case would have little significance

beyond the litigants and the people of Gloucester, Massachusetts,

were it not for the fact that the Court is here compelled to

analyze the profound contribution made by the American jury to

the very structure and fabric of American law.  In this case, the

plaintiff, exaggerating the indignity of a search of her person

incident to her arrest, sued, claiming that both the scope and

location of the search violated her civil rights.  Her compelling

tale of having been "strip-searched" following a traffic stop

earned her a trial by jury.  The jury saw through her



fabrications with relative ease,[1] but while they were at it,
condemned the "location" of the search pursuant to a proper legal
charge and awarded the plaintiff $1.00 in nominal damages.  The
Court then promptly took the dollar away from the plaintiff on
the ground that her constitutional right to be free of a search
in that location had not been "clearly established" prior to the
jury's verdict.

Despite her deceit, the plaintiff now argues that the
"provocative role of the lawsuit" in enhancing and establishing
the civil rights of the people of Gloucester entitles her  to
attorneys' fees and costs as the "prevailing" party.

II.   BACKGROUND AND PROCEDURAL POSTURE

In August 1996, Jennifer Ciulla ("Ciulla") was pulled over
while driving in Gloucester, Massachusetts, by an off-duty police
officer, Lieutenant Miles Rigny ("Rigny").  Rigny arrested Ciulla
for reckless driving and operating a vehicle after her license
had been revoked.  Ciulla was transported to the Gloucester
Police Department, placed in a holding cell, and searched by a
female employee of the Gloucester Police, Gen Linsky ("Linsky"),

---

[1] The British author Jerome K. Jerome, who once wrote, "It
is always the best policy to speak the truth, unless, of course,
you are an exceptionally good liar," must not have contemplated
the American jury's knack for detecting even the most talented of
liars.  Jerome K. Jerome, The Idler's Club, in The Idler, Feb.,
1892.

2

who was the matron-on-call.  In her complaint, during pre-trial
proceedings, and at trial, Ciulla took the position that she was
ordered by Linsky to "submit to a strip search, against her
will."  Am. Compl. ¶ 12.  Specifically, Ciulla claimed that
Linsky required her "to lift and/or remove her clothing, thereby
exposing her breasts and genital area to Linsky."  Id. ¶ 13.  In
contrast, Linsky rather diffidently testified that she only asked
Ciulla to pull her top away from her body and roll down the top
of her shorts a few inches, both with minimum exposure, so that
she could be sure Ciulla was not concealing anything in her bra
or the waistband of her undergarment[2] (for the purposes of this
opinion, a "minimum exposure search").  Linsky then at once
backed off.

During a view[3] of the Gloucester police station, the jury
observed that there was a glass window that looked in on the
holding cell where Ciulla had been searched.  On the other side
of the window lies a small observation room which, as revealed

---

[2] At the time of the search, Ciulla was wearing a bikini
bathing suit under a sports outfit consisting of a top and
shorts.

[3] The evidentiary status of a jury view is thoroughly dis-
cussed in United States v. Gray, 199 F.3d 547, 548-50 (1st Cir.
1999) (Coffin, J.).

3

during trial, is accessible by police officers and never locked.[4]
At trial, Ciulla testified that Rigny surreptitiously watched
Linsky conduct the purported strip-search through the window.
Arguing that the strip-search was unreasonable and Rigny's
alleged peeping-Tom act was a further invasion of her liberty,
Ciulla asserted claims against Rigny, Linsky, and the City of
Gloucester for (i) violations of 42 U.S.C. § 1983, 48 U.S.C. §
1986, and Mass. Gen. Laws ch. 12, § 11I (collectively, the "civil
rights claim"); (ii) intentional infliction of emotional
distress, and (iii) negligent infliction of emotional distress.
See Am. Compl. ¶ 1.  Ciulla's husband, Lawrence Ciulla, asserted
a claim for loss of consortium.  See id.

At the conclusion of a five-day trial, a jury found for
Ciulla against Linsky on the civil rights claim.  As a basis for
their verdict, in response to a special interrogatory, the jury
stated that "while we do not credit the testimony of Jennifer
Ciulla, the search that was conducted was unreasonable as
respects its necessity, manner, or location."  Jury Verdict ¶ 1.
The jury underlined the word "location."  See id.  The jury

---

[4] Ironically, when the jury arrived at the Gloucester Police
Department for its view, the door to the holding cell was, for
the first time in anyone's memory, actually locked.  From the
apparent befuddlement of the Police Chief who had to search out
a key, however, and the candid admission of counsel, the jury
gleaned that the door is normally unlocked.

assessed no compensatory damages and only one dollar in punitive damages.  See id.  The jury rejected all of the other claims. See id. ¶¶ 2-4.

After trial, Linsky filed a motion for judgment notwithstanding the verdict.  Determining that prior to the trial it was not clearly established that conducting a minimum exposure search in a location resembling the holding cell in question was constitutionally unreasonable, this Court granted Linsky's motion on the basis of qualified immunity.  Despite this Court's ruling, Ciulla here presses her motion for attorneys' fees and costs seeking a total of $87,650.77.

III. WHO PREVAILED?

Both 42 U.S.C. § 1988(b) and Mass. Gen. Laws ch. 12, § 11I authorize the Court to award attorneys' fees and costs to a prevailing party in a civil rights action.  A determination of qualified immunity does not prevent a party who otherwise prevailed from obtaining a fee award.  See Pulliam v. Allen, 466 U.S. 522, 543-44 (1984); Handy v. Penal Insts. Comm'r of Boston, 412 Mass. 759, 763 n.4 (1992).  Decisions in the First Circuit have recognized that a plaintiff may through litigation win significant practical relief favorable to her position, and thus "deserve attorneys' fees, even without a formal victory; for example, the so-called 'catalyst' theory might justify an award

5

where the defendant abandoned an unlawful practice after the case

was brought, as a direct result of the lawsuit . . . ."  Stanton

v. Southern Berkshire Reg'l Sch. Dist., 197 F.3d 574, 577 (1st

Cir. 1999) (Boudin, J.) (citing Pearson v. Fair, 980 F.2d 37, 43-

45 [1st Cir. 1992]).[5]  Moreover, at least in Massachusetts,

courts have determined that a prevailing party may be one who

simply prevailed on a "question of law . . . of 'substantial

public interest'" although obtaining no monetary relief.

Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985)

(quoting Batchelder v. Allied Stores Int'l, Inc., 388 Mass. 83,

86 [1983]); see also Zurakowski v. D'Oyley, 46 F. Supp.2d 87, 88

(D. Mass. 1999) (applying Batchelder as the controlling decision

as to Massachusetts law but denying attorneys' fees since the

plaintiff prevailed only on a matter of law of no substantial

public interest).  "Again, the inquiry is a practical one."

Stanton, 197 F.3d at 577.

Based on the verdict slip, the Court concludes that the jury

here did not believe Ciulla's claim that she was "strip-searched"

and found the minimum exposure search unreasonable only because

of its location.  At its broadest reach, the jury verdict may be

read as finding that it is constitutionally unreasonable for

---

[5] Some other federal courts have made similar statements.
See, e.g., Cartwright v. Stamper, 7 F.3d 106, 109-10 (7th Cir.
1993).

police to conduct a minimum exposure search in a "room with a view." At the very least, Ciulla established to the jury's satisfaction that it is constitutionally unreasonable for the Gloucester Police Department to continue conducting such searches in that particular location without at least hanging a shade on the window to the holding cell. Either way, the verdict's significance lies in the fact that the jury deemed an obtrusive search that falls short of a strip search constitutionally unreasonable because of location, a verdict which extends Fourth Amendment protections further than prior federal decisions. See Logan v. Shealy, 660 F.2d 1007, 1014 (4th Cir. 1981) (holding unreasonable "a *strip search* [conducted] in an area exposed to the general view of persons known to be in the vicinity") (emphasis added).

'So what?' argues defense counsel. A jury's decision does not establish "the law" and a jury verdict in itself has no precedential authority. See Howard v. Wal-Mart Stores, Inc., 160 F.3d 358, 359 (7th Cir. 1998); Summers v. Watkins Motor Lines, 323 F.2d 120, 123 (4th Cir. 1963). It is only the judgment that enters after the jury verdict that carries claim preclusive effect. See Restatement (Second) of Judgments § 13 (1982) ("The rules of *res judicata* are applicable only when a final judgment

is rendered.").  And here, as defense counsel points out, the ultimate judgment awards nothing to Ciulla.

In the interesting circumstances of this case, however, defense counsel is quite wrong. "Every legal decision depends upon a melding of the generalized standard with the particular facts at hand.  [If i]t is the judge who teaches how the melding is to take place in each individualized instance," 1 William G. Young, John R. Pollets & Christopher Poreda, Massachusetts Evidence § 102.1, at 15 (2d ed. 1998) ("Massachusetts Evidence"), then it is emphatically the jury that gives practical meaning and substance to the generalized standard by "inject[ing] community values into judicial decisions," Note, The Right to a Jury Trial in Complex Civil Litigation, 92 Harv. L. Rev. 898, 898 (1979) and by "'constantly bringing the rules of law to the touchstone of contemporary common sense.'" Commonwealth v. Canon, 373 Mass. 494, 516 (1977) (Abrams, J., dissenting) (quoting 1 W. Holds- worth, A History of English Law 348-49 [3d ed. 1922]).

"'The American jury must rank as a daring effort in human arrangement to work out a solution to the tensions between law and equity and anarchy.'"  H. Ziesel, The American Jury, in Final Report: The American Jury System 72 (Roscoe Pound & American Trial Lawyers Foundation eds. 1977) (quoting the last paragraph in H. Kalvens & H. Zeisel, The American Jury [1966]).

No other legal institution sheds greater insight into
the character of American justice.
. . . .

[Indeed a]s an instrument of justice, the civil
jury is quite simply the best we have.  '[T]he greatest
value of the jury is its ability to decide cases
correctly.'  Joiner, From the Bench, in The Jury System
in America 146 (R. Simon ed. 1975).  We place upon
juries no less a task than discovering and declaring
the truth in each case.  In virtually every instance
these twelve men and women, good and true, rise to the
task, finding the facts and applying the law as they in
their collective vision see fit.  In a very real sense,
therefore, a jury verdict actually embodies our concept
of 'justice.'
. . . .

Jurors bring their good sense and practical knowledge
into our courts.  Reciprocally, judicial standards and
a respect for justice flow out to the community.  See
Patrick Higginbotham, Continuing the Dialogue: Civil
Juries and the Allocation of Judicial Power, 56 Tex. L.
Rev. 47, 59 (1977).  The acceptability and moral
authority of the justice provided in these courts rests
in large part on the presence of the jury . . . .  It
is through this process, where rules formulated in
light of common experience are applied by the jury
itself to the facts of each case, that we deliver the
very best justice we as a society know how to provide.

The jury system proves the wisdom of the Founders
in their utilization of direct democracy to temper the
potential excesses of the only unelected branch of
government.  '[T]he jury achieves symbolically what
cannot be achieved practically -- the presence of the
entire populace at every trial.'  P. D'Perna, Juries on
Trial 21 (1984).  Through the jury we place the de-
cisions of justice where they rightly belong in a
democratic society:  in the hands of the governed.  One
could scarcely imagine that the Founders would have
created a system of courts with appointed judges were
it not for the assurance that the jury system would
remain.  In a government 'of the people' the justice of
the many cannot be left to the judgment of the few.

Nothing is more inimical to the essence of democracy than the notion that government can be left to elected politicians and appointed judges. As Tocqueville so elegantly put it, '[t]he jury system . . . [is] as direct and as extreme a consequence of the sovereignty of the people as universal suffrage.' 1 A. de Tocqueville, Democracy in America 29 (H. Reeve text 1945). Like all government institutions, our courts draw their authority from the will of the people to be governed. The law that emerges from these courts provides the threads from which all our freedoms are woven. It is through the rule of law that liberty flourishes. Yet, 'there can be no universal respect for law unless all Americans feel that it is their law.' Kaufman, A Fair Jury -- The Essence of Justice, 51 Judicature 88, 91 (1967) (emphasis in original). Through the jury, the citizenry takes part in the execution of the nation's laws, and in that way each can rightly claim that the law belongs partly to her.

Only because juries may decide most cases is it tolerable that judges decide some. However highly we view the integrity and quality of our judges, it is the judges' colleague in the administration of justice -- the jury -- which is the true source of the courts' glory and influence. The involvement of ordinary citizens in a majority of a court's tasks provides legitimacy to all that is decreed. When judges decide cases alone they 'are still surrounded by the recollection of the jury.' Tocqueville, supra at 297. Their voices, although not directly those of the community itself, echo the values and the judgments learned from observing juries at work. In reality, ours is not a system where the judges cede some of their sovereignty to juries, but rather where the judges borrow their fact-finding authority from the jury of the people.

In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution, 712 F. Supp. 994, 1004-06 (D. Mass. 1989).

In short, once properly charged, the American jury may boldly go where no judge would dare to tread. In this case,

therefore, how better to "clearly establish" the

unconstitutionality of the location of this minimum exposure

search than by the unanimous verdict of a twelve person[6] American

---

[6] Despite the rule permitting six person juries, it would
appear that federal civil juries today average from seven to nine
persons. See The Judiciary: Budget Estimates for Fiscal Year
2001 (Penultimate Draft) 7.6 (2000). At the recommendation of
my colleague, Douglas Woodlock, this Court seats twelve person
juries in every case to assure greater diversity and to improve
small group decision making. See Richard A. Posner, An Economic
Approach to the Law of Evidence, 51 Stan. L. Rev. 1477, 1498
(1999).

> [Unfortunately], on this issue the federal judiciary
> itself appears to have faded from dynamism into stasis
> in its willingness to accept a diminished, less
> representative, and thus sharply less effective civil
> jury, see Judith Resnik, Changing Practices, Changing
> Rules:  Judicial and Congressional Rulemaking on Civil
> Juries, Civil Justice and Civil Judging, 49 Ala. L.
> Rev. 133, 137-52 (1997) (decrying the failure of the
> Judicial Conference to restore twelve-person juries in
> civil cases); Development in the Law -- The Civil Jury,
> 110 Harv. L. Rev. 1408, 1466-89 (1997) (same); see also
> Michael J. Saks, Small-Group Decision Making and
> Complex Information Tasks, 26, 30 (Federal Judicial
> Center 1981), along with curbs on the number of judges
> devoted to jury trials. Leonidas Ralph Mecham, Optimal
> Utilization of Judicial Resources (1996) 14 (For the
> first time in the entire history of the Republic,
> Congress was notified in 1996 that "[t]he Judicial
> Conference is considering whether it should . . . re-
> commend that [district court judgeships] be eliminated
> or left vacant.").

Lirette v. Shiva Corp., 27 F. Supp.2d 268, 271-72 n.3 (D. Mass.
1998).

Sadly, the fear expressed above regarding judicial curbs on
the number of judges available for jury trials is coming to pass
-- and with a vengeance.

jury, that "most vital day-to-day expression of direct democracy
[, that unique but] routine aspect of our civic existence today
where citizens are themselves the government"?  Massachusetts
Evidence, supra at 11.  Now that this jury has spoken, the
qualified immunity that properly shields Linsky evaporates and
the Gloucester Police Department dare not in the future continue
minimum exposure searches in this location without some
additional privacy safeguards for the prisoner.  Thus, in the
most intensely practical fashion, Ciulla has secured for the
people of Gloucester and others who come in contact with the
Gloucester Police Department a greater degree of protection under
the Fourth Amendment than has heretofore existed.  An American
jury has said so.[7]

---

> [In 1999], the Judiciary recommended to the President
> and congressional leaders not filling a single existing
> or future district judgeship vacancy in each of the
> following courts:  District of Columbia, Southern
> District of West Virginia, District of Delaware, and
> District of Wyoming.

Leonidas Ralph Mecham, Optimal Utilization of Judicial Resources
22 (2000).  This year it appears that judgeships in the Western
District of Pennsylvania and the Eastern District of Washington
are targeted as well.  Letter from Chief Judge Marilyn L. Huff to
William G. Young, enclosure 1 (Feb. 25, 2000) (on file with this
Court).

   [7] It is altogether fitting and proper for this Court to
extol the role of the American jury.  Indeed, it is vitally
necessary to do so because today the American jury -- guaranteed
to our citizens in the Sixth and Seventh Amendments to the Bill
of Rights of the United States Constitution -- is on the wane,

perhaps irretrievably so.

### The Twilight of the American Jury?

For some time now circumstantial and anecdotal evidence has been mounting that jury trials are, with surprising rapidity, becoming a thing of the past.  Judge Patricia Wald started her recent tribute to Professor Charles Alan Wright with this striking sentence: "Federal jurisprudence is largely the product of summary judgment . . . ."  Patricia M. Wald, Summary Judgment at Sixty, 76 Tex. L. Rev. 1897, 1899 (1998).  Judge Wald is right -- and note the compelling inference -- that we are today more intellectually concerned with the procedural mechanism that blocks jury trials than we are with the trials themselves.  Anecdotally, I recently received a letter from one of Boston's foremost trial attorneys which contained this passage:

> When I came to the Bar, there were half as many judges on the [Massachusetts] Superior Court as there are now and [today] there aren't a fraction of the cases being tried as then.

> At one time we had over 50 lawyers in this office trying cases practically all the time.  Now a jury trial is an event, and that isn't just in this office . . . .  The life I lived is a thing of the past and it is very sad.

Letter from Thomas D. Burns, Esq. to William G. Young (Dec. 16, 1999) (on file with this Court).

This lawyer's lament would be slightly ludicrous if it reflected a society that was turning away from litigation or which, once embroiled in a lawsuit, increasingly utilized alternative dispute resolution to reach settlement short of trial.  Yet neither is true.  Levels of civil and criminal litigation in the federal courts continue to rise, see William H. Rehnquist, The 1999 Year-End Report on the Federal Judiciary, The Third Branch (Admin. Office of U.S.Courts, Washington, D.C.), Jan. 2000, at 4, and on the civil side the ratio of trials to settlements and pre-trial adjudications remains roughly constant.  See Judith Resnik, Trial as Error, Jurisdiction as Injury: Transforming the Meaning of Article III, 113 Harv. L. Rev. 924, 928 (2000) ("Trial as Error").

13

The simple fact is that, with ever more work to do in the federal courts, jury trials today are marginalized in both significance and frequency.

Hard evidence confirms this observation.  Over the ten years concluding in 1999, the number of civil jury trials has declined 26% and the number of criminal trials is down 21%.  During the five most recent years in this same period, overall jury trial days went down 12%.  See David Williams, Decline In Petit Juror Days, tbl.2. (Sept. 2, 1999) (unpublished Dist. Ct. Admin. Div. document, Admin. Office of the U.S. Courts, Washington, D.C.) ("Decline in Petit Juror Days").  Furthermore, funds budgeted for jurors in the federal system in FY 2000 are expected to decline by nearly 6% for FY 2001 in order to adjust to the declining number of jury trial days.  See The Judiciary: Congressional Budget Summary Fiscal Year 2000 at 50 (Feb. 2000).

If this is the national picture, overall jury usage in the District of Massachusetts is in virtual free fall, dropping a stunning 30.6% from FY 1996 to FY 1998 (the eighth steepest drop in the nation out of 94 districts considered).  Decline in Petit Juror Days, tbl.1.

I know this much is true.

In Berthoff v. United States, No. 97-10883 (D. Mass. filed Apr. 23, 1997), opinion pending, this Court will necessarily address some of the reasons for this precipitous decline.  Nevertheless, it bears repeating here that:

> Our willingness as a society to drift away from the use of civil juries reflects a failure in understanding of the jury's essential function in our American democracy.  The jury system is direct democracy at work.  It is, in fact, the most vital expression of direct democracy in America.  Today, it is the New England town meeting writ large, the people themselves governing.  In fact, the very processes of our judicial system themselves vindicate and strengthen democracy by involving litigants with standing in the application of our laws.  See Christopher J. Peters, Adjudication as Representation, 97 Colum. L. Rev. 312 (1997).  Our juries are the ultimate realization of our people working together, under law, to do justice.  De

14

Tocqueville recognized with masterful clarity that, in our jury system, Americans had embarked on a stunning experiment in direct popular rule.  See Alexis de Tocqueville, Democracy in America, 337-39 (Schocken 1st ed. 1961).  Studies show that where people have recourse to a jury trial, inequalities in economic resources are minimized, most potential litigants avoid staking out patently unreasonable positions, and the great bulk of cases ultimately settle.  Marc Galanter, Viewpoint -- How To Improve Civil Justice Policy, 77 Judicature 185 (1994).

. . . . .

'Whenever Congress extinguishes a right which heretofore has been vindicated in the courts through citizen juries, there is a cost.  It is not a monetary cost.  It is a cost paid in rarer coin -- the treasure of democracy itself.'  Andrews-Clarke v. Travelers Ins. Co., 984 F. Supp. 49, 63 n.74 (D. Mass. 1997).

When people recognize that they have been cut off from their opportunity to govern directly through citizen juries, the sense of government as community, as a shared commonwealth, is severely diminished.  Jury service is the citizen's only direct experience of government at the federal level.  Severing that shared bond, of course, leaves citizens with their right to vote but, inevitably, as the government draws away from its citizenry, that right seems less valuable.  It is not too much to say that, as our government is the ultimate teacher, Louis Brandeis, True Americanism, Brandeis on Democracy, 25, 27 (Philippa Strum ed., 1995), its devaluation of direct citizen participation carries the implicit message that communitarian efforts are simply not worth very much in an age of individual self seeking.  See Sam Roberts, Alone in the Vast Wasteland, N.Y. Times, Dec. 24, 1995, at D3.

Nor is this all.  As those institutions that em-power and reinforce community efforts fray at the edges and fall into desuetude, economic powers to which the law grants an advantage, naturally tend to use that advantage unchecked by the jury's common sense.  See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 355, 99 S. Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dis-

IV.  ASSESSMENT OF ATTORNEYS' FEES AND COSTS

     Since the jury verdict advances a matter of "substantial

public interest" in the manner sought by Ciulla, she may

theoretically be entitled to attorneys' fees and costs.  By her

motion, Ciulla seeks $71,215.00 in attorneys' fees and $16,435.77

---

senting).

Lirette, 27 F. Supp.2d at 271-72 n.3; see Stephen N. Subrin, On
Thinking About a Description of a Country's Civil Procedure, 7
Tul. J. Int'l & Comp. L. 139, 150-52 (1999).  See generally
Andrews-Clarke v. Travelers Ins. Co., 984 F. Supp. 49, 63 n.74
(D. Mass. 1997).

> Without juries, the pursuit of justice becomes in-
> creasingly archaic, with elite professionals talking to
> others, equally elite, in jargon the elegance of which
> is in direct proportion to its unreality.  Juries are
> the great leveling and democratizing element in the
> law.  They give it its authority and generalized ac-
> ceptance in ways that imposing buildings and sonorous
> openings cannot hope to match.  Every step away from
> juries is a step which ultimately weakens the judiciary
> as the third branch of government.  See Edward F.
> Hennessey, Henry Clay & T. Marvell, Complex and
> Protracted Cases in State Courts (National Center for
> State Courts 1981).  Indeed it may be argued that the
> moral force of judicial decisions -- and the inherent
> strength of the third branch of government itself --
> depends in no small measure on the shared perception
> that democratically selected juries have the final say
> over actual fact finding.

In re Acushnet River, 712 F. Supp. at 1006 & n.23.

     It is not too much to say that the greatest threat to
America's vaunted judicial independence comes -- not from any
external force -- but internally, from the judiciary's willing-
ness to allow our jury system to melt away.  See Trial as Error
supra at 1003.

in costs.  This Court is, however, "obligated to make an
independent assessment of what constitutes a 'reasonable' award
. . . ."  Connolly v. Harrelson, 33 F. Supp.2d 92, 95 (D. Mass.
1999).  Although the Court does not doubt the total number of
hours billed in this matter, the hourly rates claimed by Ciulla,
$250.00 per hour for lead counsel and $100.00 per hour for
associates, cannot be maintained for two reasons.  First, this
Court's recent analysis of attorneys' fee petitions illustrates
that lead counsel's $250 per hour rate, claimed for both in and
out-of-court time, is too steep and should be reduced to $200 per
hour.  See Zurakowski, 46 F. Supp.2d at 89 n.2 (approving in-
court hourly rate of $240.00 for one of the "foremost [civil
rights] practitioners" in Massachusetts and noting that rate
"ought not be taken as some emerging Massachusetts standard");
Connolly, 33 F. Supp.2d at 96 (approving $200.00 per hour rate in
civil rights case); United Cos. Lending Corp. v. Sargeant, 32 F.
Supp.2d 21, 23-24 (D. Mass. 1999) (approving hourly rates up to
$300 per hour only in context of class action).[8]  Second,

---

[8] It is fairly clear that there is a disturbing lack of
uniformity in this district in the awarding of attorneys' fees in
civil rights cases.  One judge simply accepts the hourly rates
claimed by counsel, while others consider a melange of factors
and ascribe varying weights to each of them.  See Remarks of the
district judges at the Federal Judicial Forum (Nov. 9, 1999).

  Published opinions over the past several years reveal the
following data:

17

Ciulla's petition does not distinguish between "core" and "non-core" work.[9]  See Connolly, 33 F. Supp.2d at 96 ("Typically, non-core work is compensated at two-thirds of the hourly rate for core work.").  With these adjustments in mind, the Court determines a reasonable fee award would be, at the most,

| Case Name | Judge | Hourly Rate |
|---|---|---|
| Alfonso v. Aufiero, 66 F. Supp.2d 183, 197 (D. Mass. 1999) | Saris | $250 |
| Stanton v. Southern Berkshire Reg'l Sch. Dist., 28 F. Supp.2d 37, 42 (D. Mass. 1998) | Ponsor | $250 |
| Guckenb rger v. Boston Univ., 8 F. Supp.2d 91, 105 (D. Mass. 1998) | Saris | $325 |
| McLaughlin v. Boston Sch. Comm., 976 F. Supp. 53, 62 (D. Mass. 1997) | Garrity | $200 |
| Morgan v. Gittens, 915 F. Supp. 457, 461, 470 (D. Mass. 1996) | Garrity | $300 |
| Visiting Nurse Ass'n v. Bullen, No. 94-10123-NG, slip op. at 10 (D. Mass. Oct. 2, 1995) | Gertner | $345 |

Since attorney fee awards are rarely published, however, this is but a limited review.  As predictability and reasonable uniformity are hallmarks of any justice system, a reliable reporter of Massachusetts attorneys' fee awards is a compelling necessity.  This is an important challenge to legal publications in this District.

[9] "[C]ore work includes legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders.  Non-core work consists of less demanding tasks, including letter writing and telephone conversations."  Brewster v. Dukakis, 3 F.3d 488, 492 n.4 (1st Cir. 1993).

$56,272.88. The Court does not dispute the calculations that place Ciulla's maximum costs at $16,435.77.

V.   BUT SHE LIED . . .

This is a case abounding in ironies. Ciulla's trial testimony about the strip search was a deliberate, straight-out, bald-faced lie.[10] Yet, had she told the truth, this Court would have granted Linsky qualified immunity pre-trial, and entered judgment for the defendants. Thus, it is only because of Ciulla's lying that her case ever reached the jury where the verdict developed an important aspect of Fourth Amendment law for the people of Gloucester, certainly a matter of substantial public interest. Absent her lies, this Court would award her attorneys' fees of $56,272.88 and costs of $16,435.77.

Because Ciulla lied, the Court denies her petition and awards her nothing. There are two reasons.

---

[10] This is not an inference drawn from the jury verdict. It is the Court's own finding drawn from presiding over the trial. Attorneys' fee petitions are equitable matters, tried to the court in civil rights cases, see King v. Rosenblatt, 560 F.2d 1024, 1027 (1st Cir.), cert. denied 438 U.S. 916 (1978), so it is both necessary and appropriate to make an explicit finding, see id. ("[I]t would be helpful for the court to set out in the record the basis for the award and any pertinent findings of fact.").

This finding in no way impugns the properly zealous advocacy of Ciulla's attorney, who throughout has acted with commendable professionalism and high ethics. He is, it ought be remembered, her advocate, not her judge. I am -- at least with respect to this petition.

19

No judicial system can reward legal advances -- even "good"
law of substantial public interest -- founded on lies.  Since
this is an equitable matter Ciulla, in seeking equity, must
herself do equity.  See Texaco Puerto Rico, Inc. v. Department of
Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995) ("It is old
hat that a court called upon to do equity should always consider
whether the petitioning party has acted in bad faith or with
unclean hands."); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d
907, 910-12 (1st Cir. 1989) (discussing "venerable maxim" that
"he who seeks equity must do equity").  She has not done so.  She
must lose.

Moreover, the Court denies her petition as an appropriate
sanction for her lies.  Jury trials are this society's most
magnificent expression of direct democracy.  Any litigant who can
state a claim may have one for a modest filing fee of $150, and
even this will be waived for those who cannot afford to pay.  See
Denton v. Hernandez, 504 U.S. 25, 27 (1992) ("The federal in
forma pauperis statute, codified at 28 U.S.C. § 1915, allows an
indigent litigant to commence a civil or criminal action in
federal court without paying the administrative costs of
proceeding with the lawsuit."); see also 28 U.S.C. § 1914
(establishing $150 fee).  Trials are not, however, otherwise
free.  Ciulla's five-day trial cost the American taxpayer

$87,500,[11] exclusive of the legal costs of the City of Gloucester which must be borne by its taxpayers. Mendacity in the course of legal proceedings is therefore an appropriate matter for monetary sanctions. See Jones v. Clinton, 36 F. Supp.2d 1118, 1125, 1127 (E.D. Ark. 1999). In this case, denial of this otherwise interesting petition is fully justified on this ground alone.

_William G. Young_
WILLIAM G. YOUNG
CHIEF JUDGE

---

[11] The average fully-distributed cost of a trial day in a United States District Court today exceeds $17,500. Five trial days at $17,500 per day equals $87,500. The budgetary support for this estimate is set out and fully discussed in In re Previtt, 975 F. Supp. 397, 398-401 (D. Mass. 1997).

21